UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT INDIANA

| | |
|---|---|
| MALIBU MEDIA, LLC,<br>Plaintiff,<br><br>v.<br><br>ANDREW LEIGHTNER, KEVIN DEMPSEY,<br>KENNETH REESE, CARL RUDY, LUCAS<br>SHULTZ, LUCIAN SAVULESCU, DAN<br>COROIAN, JIM GENDRON, JEREMY<br>COTTON, NEVILLE FERNANDES, DANIEL<br>PITTMAN, JAY GARRETT, JERRY RICHEY,<br>CONNIE FELONGCO, TERESA<br>STEPHENSON, KIRAN POULSEN, CHRIS<br>MINOR, SIWEI LI, DERICK BROOKS,<br>CLARISSA HENDERSHOT, CHRIS MINOR,<br>and JOHN DOES 2, 14, 16, 17, 20, 23, 24 and 29,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. 1:12-cv-00845-TWP-MJD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MOTION TO REQUIRE PLAINTIFF TO POST BOND
FOR COSTS AND EXPENSES**

Defendants Chris Minor and Teresa Stephenson ("Defendants"), by counsel, hereby move for an order requiring Plaintiff Malibu Media, LLC to post a $500,000 bond for costs and expenses, representing the attorney's fees and expenses Defendants reasonably expect to incur in this matter.

**I.   INTRODUCTION.**

Courts do not usually require a Plaintiff to post a bond to cover a *Defendant's* potential costs and expenses if the Defendant prevails. However, this is not a usual case. It is one of a growing number of "BitTorrent" cases that one Federal Judge describes as follows:

> "Plaintiffs have outmaneuvered the legal system. They've discovered the nexus of antiquated copyright laws, paralyzing social stigma, and unaffordable defense costs. And they exploit this anomaly by accusing individuals of illegally

1

> downloading a single pornographic video. Then they offer to settle—for a sum calculated to be just below the cost of a bare-bones defense. For these individuals, resistance is futile; most reluctantly pay rather than have their names associated with illegally downloading porn. So now, copyright laws originally designed to compensate starving artists allow, starving attorneys in this electronic-media era to plunder the citizenry.
>
> Plaintiffs do have a right to assert their intellectual-property rights, so long as they do it right. But Plaintiffs' filing of cases using the same boilerplate complaint against dozens of defendants raised the Court's alert. It was when the Court realized Plaintiffs engaged their cloak of shell companies and fraud that the Court went to battlestations."
>
> *Ingenuity 13, LLC v. John Doe*, Order Issuing Sanctions, 2:12-cv-8333-ODW, CD of CA, May 6, 2013 (Judge Wright)). (Exhibit 1).

This Court should follow the lead of other courts in BitTorrent cases and exercise its discretion to require Plaintiff to post a bond to cover Defendants' potential costs and expenses, including attorney's fees. In copyright cases, a prevailing defendant is entitled to recover her attorney's fees "as a part of costs," and here, Defendants will likely prevail. The Court may also wish to consider, *sua sponte* issuing an order to show cause why Defendant should not be required to post bond in one or more of the 80 other BitTorrent cases filed in Indiana by Malibu's counsel, Mr. Nicoletti, against about 230 defendants. This would help level the playing field and discourage any further "plundering of the citizenry."

II. A COURT HAS "WIDE" DISCRETION IN REQUIRING A PLAINTIFF TO POST A BOND TO COVER A DEFENDANT'S EXPECTED LITIGATION COSTS.

"Federal district courts have the inherent power to require plaintiffs to post security for costs." *Simulnet E. Assocs. v. Ramada Hotel Operating Co.*, 37 F.3d 573, 574 (9th Cir. 1994); *Aggarwal v. Ponce School of Medicine*, 745 F.2d 723, 726 (1st Cir., 1984); *AF Holdings LLC v. Trinh*, Case No. C 12-02393-CRB, Order Granting Motion to Post Undertaking, Nov. 9, 2012 (N.D. Cal., 2012) (Exhibit 14).

*AF Holdings LLC*, is / was a BitTorrent copyright infringement case that is essentially identical to this case. The court found it proper to require AF Holdings to post bond, stating:

> "Plaintiff's current evidence of infringement is weak. See Mot. at 7 (citing SBO Pictures, Inc. v. Does 1-3036, No. 11-4220 SC, 2011 WL 6002620, at *3 (N.D. Cal. Nov. 30, 2011) ("As many courts have noted, however, the ISP subscriber to whom a certain IP address was assigned may not be the same person who used the Internet connection for illicit purposes.")"
> (Exhibit 14, p, 2)

When the Plaintiff failed to post the bond, the court dismissed the case, and on May 24, 2013, awarded Defendant his attorney's fees.[1]

The "question of security for costs is procedural in nature, and []a trial court's discretion in administering procedural matters--even those which may arguably affect substantive rights--is wide." *Id.*, (citations omitted). *See Smith v. Ford Motor Co.*, 626 F.2d 784, 796 (10th Cir.1980); *United States v. Simmons*, 476 F.2d 33, 35 (9th Cir.1973); *Lance, Inc. v. Dewco Services*, 422 F.2d 778, 783-84 (9th Cir.1970). *Hawes v. Club Ecuestre El Comandante*, 535 F.2d 140, 143 (1st Cir.1976); *Soo Hardwoods v. Universal Oil Prods.*, 493 F.Supp. 76, 77 (W.D.Mich.1980).

The purpose of the bond is "to ensure that a prevailing party will be able to collect a judicial award of costs, expenses, and attorney's fees from a non-resident litigant." *Murphy v. Ginorio*, 989 F.2d 566, 568 (1st Cir.1993). Although the Southern District of Indiana does not have a Local Rule regarding when a Plaintiff should be required to post a bond, appellate courts have approved local rules of other districts enumerating these three considerations.

> "(1) the plaintiff's probability of success on the merits, and the background and purpose of the suit;

---

[1] This was reported by email an hour before this motion is being filed, and the award of attorney's fees is not yet available on PACER.

>    (2) the reasonable extent of the security to be posted, if any, viewed from the defendant's perspective; and
>
>    (3) the reasonable extent of the security to be posted, if any, viewed from the non-domiciliary plaintiff's perspective.  *Aggarwal v. Ponce Sch. of Medicine*, 745 F.2d 723, 727-28 (1st Cir.1984)."
>
> *Hull v. Municipality of San Juan*, 230 F.Supp.2d 239, 241 (D.P.R., 2002); *Accord, Simulnet E. Assocs. v. Ramada Hotel Operating Co*., 37 F.3d 573, 574 (9th Cir. 1994); *AF Holdings LLC v. Trinh*, Case No. C 12-02393 CRB,  Order Granting Motion to Post Undertaking ,  Nov. 9, 2012  (N.D. Cal., 2012) (Exhibit 14).

### III.    MALIBU SHOULD BE REQUIRED TO POST A BOND FOR DEFENDANTS' EXPECTED COSTS INCLUDING ATTORNEY'S FEES.

#### A.    The Probability Of Success, Background, and Purpose Of The Suit.

The first set of factors the court should consider is "the plaintiff's probability of success on the merits, and the background and purpose of the suit."  *Hall, Id.*

##### 1.    The Plaintiff's Probability of Success on the Merits.

Plaintiff Malibu is a notorious "copyright troll," having filed 866 lawsuits against thousands of persons, all alleging copyright infringement by downloading Internet porn using "BitTorrent" software.  (Exhibit 11).  It has not one a single case at trial.   In this case, Malibu is *un*likely to prevail on the merits of its cases for two reasons.  First, Malibu's claims are premised on extremely tenuous circumstantial evidence – evidence that other courts have found unlikely to succeed and that independent experts have discredited.  (Exhibit 14, Exhibit 2, Exhibit 12, p. 59).  Second, Defendants have confirmed that they did not copy the porn movies as alleged in Malibu's Amended Complaint (Exhibits 7 and 8).  Defendants have served these affidavits on Malibu, who has ignored them.

Until recently, courts have been reluctant to dismiss outright BitTorrent infringement claims. This is because BitTorrent complaints are premised on a very technically complex set of allegations and arguments that ultimately conclude with the allegation that the defendants must have copied porn movies.[2] Courts have generally concluded that as long as the ultimate allegation of "copying" appears somewhere in the Complaint, then the intermediate steps necessary to draw that conclusion are probably "plausible," allowing them to withstand a motion to dismiss. This reasoning forces defendants to pursue the case at least through summary judgment -- a costly and humiliating undertaking.

However, some judges have begun to dissect the technical allegations in BitTorrent complaints, and found that they have "glaring problems" that are "*obvious* to an objective observer *having a working understanding of the underlying technology.*" In *Ingenuity 13, LLC v. John Doe*, Order To Show Cause Re Sanctions, 2:12-cv-8333-ODW, CD of CA, February 7, 2013 (Exhibit 2), Judge Wright wrote:

> "1.     *Lack of reasonable investigation of copyright infringement activity*
>
> The first problem is how Plaintiff concluded that the Defendants actually downloaded the entire copyrighted video, when all Plaintiff has as evidence is a "snapshot observation." (AC ¶ 23.) This snapshot allegedly shows that the Defendants were downloading the copyrighted work—at least at that moment in time. But downloading a large file like a video takes time; and depending on a user's Internet-connection speed, it may take a long time. In fact, it may take so long that the user may have terminated the download. The user may have also terminated the download for other reasons**. To allege copyright infringement**

---

[2] For example, Malibu's Third Amended Complaint (Doc. 124) states:
"36. Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive;"
"51. IPP extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the file identified by the SHA-1 hash value of DC01C9734D05EC1F58F0F17E72AB2F363F0017A4 (the "Unique Hash Number")."

**based on an IP snapshot is akin to alleging theft based on a single surveillance camera shot: a photo of a child reaching for candy from a display does not automatically mean he stole it. No Court would allow a lawsuit to be filed based on that amount of evidence.**

What is more, downloading data via the Bittorrent protocol is not like stealing candy. Stealing a piece of a chocolate bar, however small, is still theft; but copying an encrypted, unusable piece of a video file via the Bittorrent protocol may not be copyright infringement. In the former case, some chocolate was taken; in the latter case, an encrypted, unusable chunk of zeroes and ones. And as part of its prima facie copyright claim, Plaintiff must show that Defendants copied the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). If a download was not completed, Plaintiff's lawsuit may be deemed frivolous.

In this case, **Plaintiff's reliance on snapshot evidence to establish its copyright infringement claims is misplaced**. A reasonable investigation should include evidence showing that Defendants downloaded the entire copyrighted work—or at least a usable portion of a copyrighted work. Plaintiff has none of this—no evidence that Defendants completed their download, and no evidence that what they downloaded is a substantially similar copy of the copyrighted work. **Thus, Plaintiff's attorney violated Rule 11(b)(3) for filing a pleading that lacks factual foundation.**

*2. Lack of reasonable investigation of actual infringer's identity*

The second problem is more troublesome. Here, Plaintiff concluded that Benjamin Wagar is the person who illegally downloaded the copyrighted video. But Plaintiff fails to allege facts in the Amended Complaint to show how Benjamin Wagar is the infringer, other than noting his IP address, the name of his Bittorrent client, and the alleged time of download.[2] Plaintiff's December 27, 2012 Response to the Court's Order to Show Cause re Lack of Service sheds some light:

> Though the subscriber, David Wagar, remained silent, Plaintiff's investigation of his household established that Benjamin Wagar was the likely infringer of Plaintiff's copyright. As such, Plaintiff mailed its Amended Complaint to the Court naming Benjamin Wagar as the Defendant in this action. (ECF No. 14, at 2.)

**The disconnect is how Plaintiff arrived at this conclusion—that the actual infringer is a member of the subscriber's household (and not the subscriber himself or anyone else)—when all it had was an IP address, the name of the Bittorrent client used, the alleged time of download, and an unresponsive subscriber."**
*Id*, Order, p. 4-5. (emphasis added)

6

Other courts corroborate Judge Wrights analysis of the defects with Plaintiff's theories. *Voltage Pictures, LLC v. Does 1-198, Does 1-12, Does 1-34, Does 1-371*, Case 6:13-cv-290-AA, Order, p. 6 (OR, May 4, 2013) ("some IP address are dynamic, some routers associated with the IP address are unsecured, more than one user shares an account associated with an IP address, some BitTorrent clients are configured in such a manner so as to only allow downloading and prevent uploading, and some IP addresses are associated with institutional accounts such as businesses or schools with a large amount of users.")

Finally, independent researchers at the University of Washington have concluded that automated software techniques used to attempt to find "BitTorrent" "infringers" produce inconclusive results and false positives:

> Our experiments uncover two principal findings:
> - Copyright holders utilize inconclusive methods for identifying infringing BitTorrent users. We were able to generate hundreds of DMCA takedown notices for machines under our control at the University of Washington that were not downloading or sharing any content.

> **6.3 Users**
> Our results show that potentially any Internet user is at risk for receiving DMCA takedown notices today. Whether a false positive sent to a user that has never even used BitTorrent or a truly infringing user that relies on incomplete IP blacklists, there is currently no way for anyone to wholly avoid the risk of complaints. But,

Challenges and Directions for Monitoring P2P File Sharing Networks – or – Why My Printer Received a DMCA Takedown Notice, Piatek, et. al. (Exhibit 12, p. 59)

Against this backdrop, Plaintiff Malibu has an uphill battle to piece together the puzzle and show a "Probability of Success on the Merits," especially in view of Defendants' strong

7

denials of copying. (Exhibits 7, 8). Moreover, there is no record of any BitTorrent Plaintiff *ever* prevailing at trial. Like other BitTorrent plaintiffs, Malibu's *modus operandi* is to dismiss cases after enough settlements have been extracted from named defendants to have turned a profit.[3] Thus, the "probability of success on the merits" factor weighs in favor of requiring Plaintiff Malibu to post a bond for Defendants' reasonable costs.

2. Background Of The Suit.

See the quotation from Judge Wright on page 2. ("Plaintiffs have outmaneuvered the legal system. . . .")

As further background, the BitTorrent litigation model involves a handful of highly coordinated plaintiffs' attorneys. The two Plaintiffs that have made the most filings in Indiana are Malibu Media and "Patrick Collins, Inc." National counsel for both these Plaintiffs is Michael K. Lipscomb of Florida; he engages other counsel in various regions to file suit. Plaintiff's counsel in this case is Paul Nicoletti, who handles Malibu and Patrick Collins cases in Indiana, Illinois and Michigan. Together, these two Plaintiffs have filed 1,129 lawsuits. (Exhibit 11). The BitTorrent attorneys in various regions work closely with each other. For example, in one Patrick Collins case, the Steele Hansmeier Firm provided an *amicus* brief. (Exhibit 12). This is the same Firm whose attorneys were *severely* sanctioned by Judge Wright, in the *Ingenuity 13* suit above, based on a complaint similar the present case.[4] BitTorrent attorneys

---

[3] The first "bellwether" BitTorrent case is scheduled to go to trial June 10, 2013. Case 12-cv-02078-MBB, Malibu Media v. John Does 1-22, ED, Pa.

[4] "As a punitive measure, the Court doubles this award, yielding $81,319.72.[5] This punitive multiplier is justified by Plaintiffs' brazen misconduct and relentless fraud. The Principals, AF Holdings, Ingenuity 13, **Prenda Law**, and Gibbs are liable for this sum jointly and severally, and shall pay this sum within 14 days of this order. Second, there is little doubt that that **Steele, Hansmeier**, Duffy, Gibbs suffer from a form of moral turpitude unbecoming of an officer of the court. To this end, the Court will refer them to their respective state and federal bars. Third, though Plaintiffs boldly probe the outskirts of law, **the only enterprise they resemble is RICO.** The

8

also share other resources.  For example, settlement inquiries involving different plaintiffs are referred to the mysterious "Ms. Elizabeth Jones."  She refuses to provide a street or email address and communicates only by phone; she uses a telephone number from Florida, where Mr. Lipscomb is located.

A background of the BitTorrent litigation business model is in the Answer and Counterclaim (and 7 Exhibits) of Jeffrey Fantalis, another defendant sued by Malibu.  (Exhibit 12).  The Court is specifically directed to the detailed explanation at p. 12-33 of the Answer.  However, a few points are especially noteworthy:

- Malibu's attorneys acknowledge that "the average cost of copyright litigation is 600K through trial," and this should be a factor in resolving cases:

> Toward that end, you should also apprise your clients that the average cost of a copyright litigation is 600K through trial, according to an AIPLA survey of fees in IP cases.  This is a relatively simple case but the fees will nevertheless be substantial and indubitably in the 6 figures.

  Exhibit 12, p. 71.

- Many BitTorrent claims are initiated not by the copyright owner, *but by the opportunistic attorney* in the Lipscomb/Nicoletti enterprise who contacts those owners:

---

federal agency eleven decks up is familiar with their prime directive and will gladly refit them for their next voyage. The Court will **refer this matter to the United States Attorney for the Central District of California**. The (sic) will **also refer this matter to the Criminal Investigation Division of the Internal Revenue Service** and will notify all judges before whom these attorneys have pending cases. For the sake of completeness, the Court requests Pietz to assist by filing a report, within 14 days, containing contact information for: (1) every bar (state and federal) where these attorneys are admitted to practice; and (2) every judge before whom these attorneys have pending cases." (Exhibit 1, p. 10-11) (emphasis added).

> Welcome, and you can also tell your clients that IPP is one of three companies doing these scans and that they provided me with information which establishes several of your clients infringed movies from studios that I do not represent. **In my individual suits, I am going to call all of those studios and have them become additional plaintiffs. Right now, statistically there is only about a .1 percent chance they'll get hit by these studios with a suit. Then I am going to go the other two companies that scan and get all the other plaintiffs I can from all of them.**

Exhibit 12, p. 72.

Attorney's representing Bittorrent plaintiffs have history of being sanctioned. For example:

> "Gibbs's statement is a blatant lie. His statement resembles other statements given by Plaintiffs in this and their other cases: statements that sound reasonable but lack truth. Thus, the Court concludes that Gibbs, even in the face of sanctions, continued to make factual misrepresentations to the Court." (Exhibit 1, p 7).

> "it is clear that the Principals' enterprise relies on deception. Part of that ploy requires cooperation from the courts, which could only be achieved through deception." (Exhibit 1, p. 8)

> "The Principals also obfuscate other facts, especially those concerning their operations, relationships, and financial interests. The Principals' web of disinformation is so vast that the Principals cannot keep track—their explanations of their operations, relationships, and financial interests constantly vary." (Exhibit 1, p. 8).

Mr. Nicoletti, who is lead counsel for Malibu in this case, similarly has a lengthy track record of sanctions for filing frivolous lawsuits, harassing litigants, and other willful violations. Publicly identifiable sanctions total over $60,000. (Exhibit 13)

With this "background of the suit," Malibu should be required to post a substantial bond. Malibu concedes that the cost of defense is "indubitably in the 6 figures," and implies that this factor, as opposed to any actual liability, is why defendants should settle.

Unfortunately, Malibu is correct – many Defendants are forced to settle due to the possible defense costs. However, Defendants will be better able to hire an attorney if that attorney has greater assurance of getting paid if they prevail by Malibu having posted a bond. Malibu has no presence in Indiana. Even if a Defendant prevailed and was awarded her costs

and attorney's fees, collecting them is unlikely, unless a bond has been postedis. ("Even if the Court enters such a sanction, it is certain that Plaintiffs will transfer out their settlement proceeds and plead paucity." Exhibit 1, p. 9 (explaining why counsel was sanctioned in addition to Plaintiff)). Without a bond, the costs of litigation heavily tip the scales of justice in Malibu's favor, and that is not fair.

    3. <u>Purpose Of The Suit.</u>

Courts have repeatedly objected to the tactics employed by the attorneys representing BitTorrent plaintiffs, noting that the cookie-cutter complaints and filings appear calculated, not to recover for legitimate intellectual property violations, but to extort cost-of-defense nuisance settlements from Defendants by publicly connecting them to pornography. This was eloquently stated in Judge Wright's summary on page 2 above. Other courts that have dug into the facts of these cases have expressed the same concern:

> "[The issue] is the manner of conducting litigation, whether the lawsuits are filed for an improper purpose, which does not include actually litigating the cases to a conclusion but rather just squeezing money out of these people." *K-Beech v. John Does 1-85*, 3:11cv469 (ED, Va.) (addressing sanctions) (Transcript of Sanctions Hearing, p. 21-22, Exhibit 5)[5]

> "If [p]laintiff decides instead to continue to 'pick off individual John Does, for confidential settlements, the Court may draw an inference that [p]laintiff is not serious about proving its claims, or is unable to do so." *Malibu Media LLC v. John Does 1-16, John Does 1-14, John Does 1-22*, Civil Action Nos. 12-2078, 12-2084, 12-2088, 2012 WL 4717893, at *9 (E.D. Pa. Oct. 3, 2012).

> "Indeed, while plaintiff earnestly claims to be defending against the plague of peer-to-peer copyright infringement and protect the hardworking men and women who produce movies right to down to the gaffer and grip, [it] appears to be employing a somewhat underhanded business model of its own to rise profits for what may be a less than profitable, unpopular movies. . . . plaintiff's tactics in these BitTorrent cases appears to not seek to litigate against all the Doe defendants, but to utilize the court's subpoena

---

[5] Pages 9 and 11 of this transcript identify the Florida "Lipscomb" law firm. This firm orchestrates the majority of Bittorrent cases around the country, and in this case, engaged Mr. Nicoletti.

11

powers to drastically reduce litigation costs and obtain, in effect, $7,500 for its product which, in the case of Maximum Conviction, can be obtained for $9.99 on Amazon for the Blu-Ray/DVD combo or $3.99 for a digital rental.  The court will follow the majority of other courts in declining to condone this practice . . . ."  *Voltage Pictures, LLC v. Does 1-198, Does 1-12, Does 1-34, Does 1-371*, Case 6:13-cv-290-AA, Order, p. 8-10 (OR, May 4, 2013).

"While the courts favor settlements, filing one mass action in order to identify hundreds of [D]oe defendants through pre-service discovery and facilitate mass settlement, is not what the joinder rules were established for." *SBO Pictures, Inc. v. Does 1-3036*, No. 11-4420, 2011 WL 6002620, at *4 (N.D. Cal. Nov. 30, 2011) (internal quotation and citation omitted).

Plaintiff's practice of improperly joining multiple unrelated defendants also has the effect of depriving the Court of its proper filing fees.  *Voltage Pictures, LLC v. Does 1-198, Does 1-12, Does 1-34, Does 1-371*, Case 6:13-cv-290-AA, Order, p. 3 (OR, May 4, 2013) (Exhibit 6).  ("the manner in which plaintiff is pursuing the Doe defendants has resulted in $213,850 savings in filing fees alone.  While these costs are substantial, the amounts sought from each individual defendant is $30,000."

Malibu's stratagem in these cases is characterized by improper joinder of unrelated Defendants, including John Does, to save filing fees and to negotiate above-market settlements so Defendants can distance themselves from a public association with pornography.  Its claims are based on a cascading set of discredited technical assumptions about BitTorrent "log files."  In sum, the "purpose of the lawsuit" factor strongly favors requiring Malibu to post a $250,000 bond.

### B.     The Reasonable Extent Of Security, From the Defendants' Perspective.

A reasonable extent of security for each Defendant would be the amount of costs and expenses they could be expected to be awarded from Malibu should each prevail.  Significantly, under the Copyright Act, "the court may also award a reasonable attorney's fee to the prevailing party *as part of the costs*."   Moreover, the Seventh Circuit has noted that the presumption in

favor of awarding fees to a prevailing Defendant is "very strong." <u>Assessment Techs. of Wisconsin, LLC v. Wire Data, Inc.</u>, 361 F.3d 434, 436 (7th Cir. 2004). In addition, courts have noted that Defendants may also be entitled to "collect some of their litigation costs" from Malibu if, as suspected, the copyright infringement action amounts to an abuse of civil process. *See Malibu Media*, 2012 WL 7748917, at *9.

To assess reasonable fees for intellectual property litigation, this Court has approved the American Intellectual Property Law Association's Economic Survey. *Eli Lilly and Co. v. Zenith Goldline Pharm.*, 264 F.Supp.2d 753, 766 (S.D. Ind., 2003) ("The Federal Circuit has approved use of the American Intellectual Property Law Association's economic survey in awarding fees under § 285; See also *View Engineering, Inc. v. Robotic Vision Systems, Inc.*, 208 F.3d 981, 987 (Fed.Cir.2000)") (citations omitted). Malibu's attorney also acknowledges that the AIPLA Survey is a proper predictor of the defense costs. (Exhibit 12, p. 71, "the average costs of a copyright litigation is 600K through trial, according to an AIPLA survey.")

Here, the most recent AIPLA Survey shows that for copyright infringement litigation involving under $1,000,000 in the "Other Central" region of the U.S., the median legal fee to take a case through trial is $250,000. (Exhibit 3). Thus, a reasonable security for Malibu to post is $250,000. If anything, this amount may be low for two reasons. First, Malibu's theories of liability involve complex technical analyses of the Internet, computers and software. These will require expensive expert witnesses not normally required for copyright infringement suits, the costs of which would be recoverable. Second, Malibu's counsel himself cited the "600K" figure.

### C. The Reasonable Extent Of Security, From the Plaintiffs' Perspective.

A bond of $250,000 per defendant should be more than reasonable from the Plaintiff's perspective. As noted by Judge Wright, Malibu's business model is based on "outmaneuver[ing] the legal system. They've discovered the nexus of antiquated copyright laws, paralyzing social stigma, and unaffordable defense costs." Malibu's "business" *is* filing lawsuits and extracting settlement agreements. It relies on the fact that infringement litigation is inherently expensive, acknowledging that the average cost is "600K." Allowing Malibu to foist onto the publicly financed judicial system the bulk of its cost of doing business is inherently unfair and tips the scales of justice in Malibu's favor. Requiring Malibu to post a bond for Defendants' potential costs will help even the scales. It is well within the "wide" discretion of this Court in "administering procedural matters." *Aggarwal v. Ponce School of Medicine*, 745 F.2d 723 (1st Cir., 1984). Of course, if Malibu ultimately prevails, the bond would be returned, with interest, so Malibu has little to lose.

### D. Requiring A Bond Will Deter Additional Nuisance Suits.

In exercising its "wide" discretion, the Court should also consider that frivolous litigation brought by intellectual property "trolls" is a growing societal problem that burdens the judiciary. While this BitTorrent case involves *copyright* infringement claims, it is analogous to the growing number of "patent troll" cases in which a patent owner has no real "business" except to sue others for patent infringement to extract a nuisance settlement. This is the type of case to which Federal Circuit Chief Judge Rader referred in his now-famous speech regarding the viral spread of frivolous infringement litigation. He urges the judiciary to exercise its powers to deter these "cases that are brought only to obtain revenue from litigation avoidance instincts. In that sense, this recommendation is part of the responsibility of the bench and bar to protect the integrity of

the US judicial structure" and ensure that "we do not allow our courts to be used for anything, except the pursuit of justice!" He goes on to state that "When the case is over and the court can identify a troll or grasshopper, I strongly advocate full-scale reversal of attorney fees and costs!" (Exhibit 10, p. 18-19). Although Judge Rader's call to action was directed toward patent infringement trolls, his guidance is equally applicable to BitTorrent / copyright infringement trolls. However, his urging for reform offers no solace for the innocent defendants who cannot find attorneys that can wait "until the case is over" to be paid. Requiring a Plaintiff like Malibu to post a bond for possible defense costs *early in the case* will deter it and other Plaintiffs who attempt to "outmaneuver the legal system" and "plunder the citizenry."

## IV. CONCLUSION

**WHEREFORE**, Defendants request that Plaintiff Malibu be required to post a $250,000 bond for each of them ($500,000 total) within ten (10) days of the Court's order at the peril of suffering dismissal.

If this motion is granted, Defendants also invite the Court to consider entering Orders to Show Cause why Defendants should not be required to post bond in the other cases filed by Mr. Nicoletti in Indiana (Exhibit 11).

Respectfully submitted,

By: s/Paul B. Overhauser
Paul B. Overhauser
**OVERHAUSER LAW OFFICES LLC**
740 W. Green Meadows Dr., Suite 300
Greenfield, IN  46140-4019
Phone: 317-891-1500
Fax: 866-283-8549
Attorneys for Defendants Teresa Stephenson and Chris Minor

© 2013

## EXHIBITS

| | |
|---|---|
| 1 | *Ingenuity 13, LLC v. John Doe*, Order Issuing Sanctions, 2:12-cv-8333-ODW, CD of CA, May 6, 2013 (Judge Wright)) |
| 2 | *Ingenuity 13, LLC v. John Doe*, Order To Show Cause, 2:12-cv-8333-ODW, CD of CA, Feb. 7, 2013 (Judge Wright)) |
| 3 | AIPLA Survey of Cost of Copyright Infringement Litigation |
| 4 | Amicus Brief By Steele Hansmeier |
| 5 | Transcript of Sanctions Hearing, *K-Beech v. John Does 1-8,5* 3:11cv469 (ED, Va.) |
| 6 | Order, *Voltage Pictures, LLC v. Does 1-198, Does 1-12, Does 1-34, Does 1-371*, Case 6:13-cv-290-AA, Order, p. 6 (OR, May 4, 2013) |
| 7 | Stephenson Declaration |
| 8 | Minor Declaration |
| 9 | Indiana BitTorrent Suits Filed By Paul Nicoletti |
| 10 | Rader – The State of Patent Litigation |
| 11 | List of Malibu and Patrick Collins Cases (Nationwide) |
| 12 | Fantalis Answer and Counterclaim, including Exhibits |
| 13 | List of Cases involving Paul Nicoletti |
| 14 | *AF Holdings LLC v. Trinh*, Case No. C 12-02393 CRB, Order Granting Motion to Post Undertaking, Nov. 9, 2012 (N.D. Cal., 2012) |

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing is being filed electronically, and notice hereof will automatically be sent to all counsel of record that participate in electronic filing, by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: s/Paul B. Overhauser
Paul B. Overhauser