## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT INDIANA

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 1:12-cv-00845-TWP-MJD |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW LEIGHTNER, KEVIN DEMPSEY, | ) | |
| KENNETH REESE, CARL RUDY, LUCAS | ) | |
| SHULTZ, LUCIAN SAVULESCU, DAN | ) | |
| COROIAN, JIM GENDRON, JEREMY | ) | |
| COTTON, NEVILLE FERNANDES, DANIEL | ) | |
| PITTMAN, JAY GARRETT, JERRY RICHEY, | ) | |
| CONNIE FELONGCO, TERESA | ) | |
| STEPHENSON, KIRAN POULSEN, CHRIS | ) | |
| MINOR, SIWEI LI, DERICK BROOKS, | ) | |
| CLARISSA HENDERSHOT and JOHN DOES | ) | |
| 14, 16, 17, 20, 23, 24 and 29, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS MOTION TO REQUIRE PLAINTIFF TO POST BOND FOR COSTS AND EXPENSES

### I.    INTRODUCTION

Plaintiff respectfully requests the Court deny Defendant's Motion because Defendant is not likely to be the prevailing party, Defendant will suffer no prejudice, and requiring Plaintiff to post a bond will violate the purposes of the Copyright Act and Plaintiff's right to petition the Court.  "The rule is a scalpel, to be used with surgical precision as an aid to the even-handed administration of justice, not a bludgeon to be employed as an instrument of oppression." *Aggarwal v. Ponce Sch. of Med.*, 745 F.2d 723, 728 (1st Cir. 1984)

Defendant's motion does not hide his intent – to bludgeon Plaintiff for bringing its valid suits and in doing so, avoid liability for copyright infringement.  Indeed, it is filled with guilt-by-association *ad hominem* attacks.  What Defendant fails to discuss is that if the Court grants his

1

motion Plaintiff will be denied its fundamental right to access the Court.  This goes against Seventh Circuit precedent.  The purpose of a security bond is not to sanction or deter a plaintiff, but to ensure a defendant will be compensated if a plaintiff is not financially healthy or has brought a frivolous case.  In doing so, the Court must be careful to consider Plaintiff's right to petition the Court.

Plaintiff Malibu Media is the creator of high end and popular adult content for its subscription website X-Art.com.  Malibu Media currently has tens of thousands of subscribers but faces a significant threat to its business because its movies are repeatedly stolen through the BitTorrent protocol.  Plaintiff knows that over 80,000 unique individuals illegally download its movies per month through the BitTorrent protocol, many of which reside in this district.  Plaintiff has no other way to make the infringement stop and seek recourse for its losses than to bring a suit like the one before this Court and issue a Rule 45 subpoena to learn the Defendant's identity.  While some courts have criticized Plaintiff for the proliferation of its suits, Plaintiff's suits are only reflective of the mass infringement it suffers daily.  Here, a ruling requiring Plaintiff to post a bond for $250,000 before having the opportunity to litigate its case would catastrophically undermine Plaintiff's right to sue for copyright infringement.  For these reasons, as more fully explained below, Plaintiff respectfully requests that the Court deny Defendant's motion.

## II.   FACTS

### A.  Malibu Media's Enforcement Campaign

Colette Pelissier Field, with her husband Brigham Field, are the owners of Malibu Media and began their business from scratch.  Field Declaration at ¶ 3 (Exhibit A).  Ms. Field was a real estate agent and Mr. Field was a photographer.  *Id*. at ¶ 4.  When the real estate market started heading south, Ms. Field knew she and her husband needed to start a business together.  *Id*. at ¶

5.  The Fields both felt that there was a lack of adult content that was beautiful and acceptable for women and couples.  *Id*. at ¶ 6.  The Fields wanted to create this type of content to satisfy what they hoped was an unfulfilled demand.  *Id*.   Their goal was to create erotica that is artistic and beautiful.  *Id*. at ¶ 7.  The Fields chose the name 'X-Art' to reflect their artistic aspirations, and began investing all of their available money and resources into the production of content – particularly erotic movies with high production value and a cinematic quality.  *Id.* at ¶ 8.

Their vision has become a huge success.  Currently, X-Art.com has tens of thousands of members.  *Id.* at ¶ 15.  Their customers pay a monthly subscription fee of $19.95 or an annual subscription fee of $99.95 to access their library of HD Video content.  *Id*. at ¶`12.  Internet subscription sales are and have always been by far X-Art's primary source of revenue.  *Id*. at ¶ 13.  The Fields invest millions of dollars a year producing content and running X-Art.com.  *Id*. at ¶ 14.  They have invested millions of dollars into their business in order to produce the best quality product.  *Id*. at ¶ 16.  For the first three years (when their site was not as popular) they did not have as many issues with piracy.  *Id.* at ¶ 15.  Now that their videos are highly desirable, more people steal their videos than pay for a subscription.  *Id*.  Malibu Media has even started to receive many complaints from its members asking why they should pay to subscribe when Malibu Media's movies are available for free through BitTorrent.  *Id*. at ¶ 16.  Plaintiff Malibu Media has filed suit in this judicial District and in judicial districts across the country seeking to deter and stop the infringement.  Malibu Media has no other choice.

Recently, popular men's magazine GQ did a feature on X-Art.[1]  *See* Exhibit B.  GQ did not hesitate to qualify X-Art's success as a company.  "Investing in next-level cinematography - with a mantra to eschew porn tropes - the mom-and-pop American start-up has grown into a

---

[1] http://www.gq-magazine.co.uk/girls/articles/2013-03/13/brigham-colette-field-x-art-sex-scene (Exhibit B)

global production team, accessed by viewers in the hundreds of millions." *Id*.  Indeed, the GQ article aptly describes the talent of Brigham Field, the emotional intelligence behind the X-Art videos, and the fact that the crew works incredibly hard, filming throughout the world with the most talented directors, to present the best videos possible.  Malibu Media is a famous, successful, and extremely valuable company.

B.  The Infringer

Defendant Minor has infringed 6 (six) of Plaintiff's movies over the course of four months and Defendant Stephenson has infringed 3 (three) of Plaintiff's movies over the court of two and a half months. *See* Complaint.  By downloading each of these movies through the BitTorrent protocol, Defendants simultaneously distributes these movies to others, allowing other people to also steal Plaintiff's movies.  *See* Complaint ¶ 11.  Defendants are both subscribers of Comcast.  Comcast routinely sends out Digital Millenium Copyright Notices regarding mainstream movies and music.  During discovery, Plaintiff will subpoena Comcast for these notices.

On Monday, Plaintiff tried the first ever BitTorrent copyright case.  *See Malibu Media v. John Doe 1 et al*, 12-cv-02078 (E.D. Pa. June 10, 2013).  In that case, Comcast testified that it was "absolutely certain" as to the accuracy of its look ups.  *Id*. at CM/ECF 195 (Audio Transcript of the Hearing – Comcast's Deposition Read Into Trial).  IPP, Ltd., Plaintiff's investigator, also testified that its identification method is error proof, and without question correctly correlates the IP address to the infringement.  *Id*. (Audio Transcript of the Hearing – Testimony of Tobias Feiser and Michael Patzer, employees of IPP, Ltd.).  Plaintiff's expert witness, Patrick Paige, a former police office specializing in forensic analysis of computer crimes, also testified.  *Id*. (Audio Transcript of the Hearing – Testimony of Patrick Paige). Patrick Paige independently tested IPP's software and reported it was 100% accurate.  *Id*.

Further, Patrick Paige testified that when he investigated child pornography crimes, in approximately 200 instances where an IP address was used to identify the criminal, only once did it not occur in the house that the Internet Service Provider identified as the IP address owner's home. *Id*. In that case, it was the home directly behind the IP address owner, in close proximity. *Id*. Here, given the time frame and length of infringement, it is almost certain the infringement occurred within the Defendants' home.

### III.   **LEGAL ARGUMENT**

#### A.   **Legal Standard**

"In requiring a security bond for defendants' costs, care must be taken not to deprive a plaintiff of access to the federal courts. To do so has serious constitutional implications." *Simulnet E. Associates v. Ramada Hotel Operating Co.,* 37 F.3d 573, 575-76 (9th Cir. 1994). "No statute or rule, or decision of this circuit, expressly authorizes a court to require the posting of a bond to secure the payment of costs to a party should he prevail in the case." *Anderson v. Steers, Sullivan, McNamar & Rogers*, 998 F.2d 495, 496 (7th Cir. 1993). "A court may require a bond where 'there is reason to believe that the prevailing party will find it difficult to collect its costs' when the litigation ends." *Gay v. Chandra*, 682 F.3d 590, 594 (7th Cir. 2012).

Factors to be considered when requiring a bond are the "(1) the merits of the case, (2) the prejudice to the defendant of not requiring a bond, and (3) the prejudice to the plaintiff of requiring a bond." *Id*. citing *Aggarwal v. Ponce School of Medicine,* 745 F.2d 723, 727–28 (1st Cir.1984).

"[A] federal court's discretion to require security for costs should not be exercised in a manner that interferes with the policy of the underlying federal statute." § 2671 Security for Costs, 10 Fed. Prac. & Proc. Civ. § 2671 (3d ed.) "[B]efore requiring a bond to cover costs under Rule 54(d), a court must consider a party's ability to pay. A court abuses its discretion

when it requires a cost bond that it knows the party cannot afford."  *Gay v. Chandra*, 682 F.3d 590, 593 (7th Cir. 2012).

> [T]oll-booths cannot be placed across the courthouse doors in a haphazard fashion. The district court, in the exercise of its sound discretion, must settle upon an assurance which is fair in the light not only of the case itself and of the exigencies faced by the defendant, but also fair when illuminated by the actual financial situation of the plaintiff. The rule is a scalpel, to be used with surgical precision as an aid to the even-handed administration of justice, not a bludgeon to be employed as an instrument of oppression.

*Murphy v. Ginorio*, 989 F.2d 566, 568 (1st Cir. 1993).  "This rule shall be liberally interpreted in favor of the plaintiff so as not to preclude his right to sue through excessive bond requirement." *Id.*

## B.    The Merits of the Case Weigh in Favor of Plaintiff

Plaintiff caught Defendants stealing many of its movies over months.  Plaintiff has an undisputable right to sue Defendant for copyright infringement.  Indeed, if Plaintiff had not brought this suit, Plaintiff has no doubt the infringement would have continued.  In the suit before this Court, Plaintiff's claims are not for a singular act but brought against a habitual infringer.  The merits of this case weigh in favor of Plaintiff bringing its claims.

### 1.   Defendants' Declarations Are Not Sufficient to Determine Liability

The facts in this case overwhelmingly demonstrate that Defendants or someone in their home are guilty of copyright infringement.  Defendants have not provided any defenses – other than a denial.

Defendants rely mostly in their motion on BitTorrent cases from California and Oregon where plaintiffs only allege one infringement, at one point in time.  *See* Def's Motion at *5 citing *Ingenuity 13, LLC v. John Doe*, 12-cv-8333-ODW (C. D. Cal. Feb. 7, 2013) ("To allege copyright infringement based on an IP snapshot is akin to alleging theft based on a single surveillance camera shot.")  Indeed, even Judge Wright would likely acknowledge Plaintiff's

6

case against Defendants, with infringements lasting for several months, is a different case than that in *Ingenuity*.

Defendants declarations are identical and simply state they did not use BitTorrent to download Plaintiff's movies. But as Plaintiff found in its recent trial, Defendant's statements are not always credible. *See Malibu Media v. John Doe 1 et al*, 12-cv-02078 (E.D. Pa. June 10, 2013) CM/ECF 196. Indeed, in that case two of the defendants actually admitted to originally lying under oath about not having committed the infringement. Further, another Defendant signed a declaration and then later admitted it was a family member that committed the infringement. *Id.*

Once Plaintiff deposes Defendants under oath, Plaintiff believes the name of the true infringer – if not Defendant but a family member of Defendant's – will come out. At that point Plaintiff will substitute in the true infringer as the Defendant. If either Defendant wishes to provide Plaintiff with this information now, Plaintiff will immediately substitute in the name of the true infringer and Defendant will not need to incur any additional attorney's fees.

### 2.   Plaintiff's Technology is Reliable

As stated above, Plaintiff recently demonstrated the reliability of its technology at a trial in Philadelphia. Simply put, IPP's software established a direct TCP/IP connection with the John Doe Defendants' IP address. When a direct TCP/IP connection is established, it is the equivalent of a camera recording the transaction, it cannot be faked. At trial, Plaintiff's investigator, Tobias Fieser, will testify to this fact, just as he did on Monday. And, at trial Plaintiff's expert Patrick Paige will testify and demonstrate that he independently tested the software and it works.

Plaintiff's investigative technology also accounts for false positives. Indeed, Defendant's motion cites to a study that concludes the best approach to accurately identify IP addresses is to establish a direct connection with the infringing user and verify the contents received:

7

> A more thorough approach to detecting infringement in BitTorrent would be to adopt the stated industry practice for monitoring the Gnutella network: <u>in the case of suspected infringement, download data directly from the suspected user and verify its contents.</u>  Because we have notified several enforcement agencies … we expect increasing use of direct downloads for verifying information.[2]

(Emphasis added.)    Plaintiff used this <u>exact</u> process to identify Defendant's IP address. Plaintiff's investigative service, IPP Limited, established a direct one to one connection with a computer using Defendant's internet service and received a piece of Plaintiff's copyrighted movie from that computer.  "A direct and continuous connection between the IPTRACKER-server and the uploader of the file is established and exists at least 10 seconds before, during and at least 10 seconds after the capture sequence i.e. during the whole download process."  (Dec. Tobias Feiser Ex. A. at *4.)  Plaintiff's investigator retains evidence of each connection with Defendant.

Further, as Defendant's study suggests, Plaintiff has taken additional safeguards for accuracy by verifying the content received from Defendant.[3]  Plaintiff has a human "in the loop" to provide a manual check of the identifying material.  As Plaintiff's investigator, Tobias Fieser, attests, "Our software analyzed each BitTorrent "piece" distributed by each IP address listed on Exhibit B and verified that reassembling the pieces using a specialized BitTorrent Client results in a fully playable digital motion picture."  (Dec. Tobias Fieser at ¶ 21.)  Plaintiff is absolutely certain that Defendant's IP address downloaded, controlled, and distributed Plaintiff's copyrighted work to its investigative service.  Defendant's study supports Plaintiff's findings.

---

[2] Def.'s Mot. 9 citing Michael Piatek, Tadayoshi Kohno, & Arvind Krishnamurthy, *Challenges and Directions for Monitoring P2P File Sharing Networks – or – Why My Printer Received a DMCA Takedown Notice*, 3rd USENIX Workshop on Hot Topics in Security (HatSec '08), July 2008.
[3] Piatek at *6.

Plaintiff's expert verified and testified to the fact that the movies download by Defendant were viewable.  "I viewed the Movie side-by-side with the digital media file identified by the hash value set forth on Exhibit B and determined that the digital media file contained a movie that was identical, strikingly similar or substantially similar."  Dec. of Tobias Fieser at *3. Defendant's argument that the movie may not have been viewable is frivolous because Defendant downloaded ten different movies over a long period of time.  This argument may have been convincing in BitTorrent suits where only one infringement was alleged, but here, it's obvious that the movie was viewable because the infringer continued to illegally download new movies by Plaintiff after each new movie was released.

## C.  Defendant Will Not Be Prejudiced if the Court Denies His Motion

### 1.  Plaintiff Is An Established Company That Will Be Able To Pay An Attorney's Fee Award

Defendants will not be prejudiced by a denial of their motion because, in the event either is found not to be guilty, Plaintiff has significant assets to pay for costs and fees.  As Plaintiff stated in its declaration, "Internet subscription sales are and have always been by far our primary source of revenue."   Field Declaration ¶ 13.  Plaintiff is a successful multimillion dollar company.  Plaintiff's movies are filmed throughout the world in beautiful and exotic locations. Its producers, models, directors, and artists are highly regarded in their field and each year Plaintiff invests millions of dollars into its intellectual property.  Indeed, Plaintiff has tens of thousands of subscribers pay it a subscription fee every month.  GQ magazine, speaking of only one of Plaintiff's films released in the last year, noted: "With 2012's *Farewell*, they released their most filmic production yet: narrative driven, with budget and nuance unprecedented in the industry."  *See* Exhibit B.

Defendants point to the number of suits Plaintiff has brought throughout the country.  But what Defendants do not mention is that Plaintiff – not once – has ever failed to pay costs involved in litigation.  Further, Plaintiff's claims have never been dismissed on a Motion to Dismiss.  Nor has a court ever entered Rule 11 sanctions against Plaintiff for a frivolous claim.  Simply put, Plaintiff has never brought a claim that lacked merit or was in bad faith.  Plaintiff should not be punished now because it has brought multiple suits if each suit has merit.  Indeed, Plaintiff is the victim of mass intellectual property theft.  Plaintiff must bring multiple suits to deter infringement.  Any fear that Plaintiff will not be able to pay fees in the unlikely event they are awarded is without basis.

### 2.   Defendant Grossly Overestimates the Costs for Him to Defend the Suit

Defendants' estimation of the costs to defend this case fails to account for the fact that a number of defendants and attorneys will likely be defending the same or similar claims.  Attorneys will likely share depositions, strategies, experts, costs, motions, pleadings and other general litigation costs.  Indeed, Defendants' own counsel represents a number of Defendants and always files the same motion on behalf of each client.  Defendants' motion here is a perfect example.  In the grand scheme, it is likely that Defendants' costs would be fairly low for an intellectual property case given all of Defendants' counsel's clients to share it with.

### 3.   Attorney's Fees Under the Copyright Act are Discretionary

Even if either Defendant was to prevail in this case, attorney's fees under the Copyright Act are discretionary.  "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505.  Factors in considering whether to award attorney's fees under the Copyright Act include: "frivolousness,

motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance consideration of compensation and deterrence." *Gonzales v. Transfer Technologies, Inc.*, 301 F.3d 608, 609 (7th Cir. 2002).

In this case, Plaintiff's claims against Defendants are reasonable, particularly given the number of infringements and long time period which the infringement occurred. This is coupled with the fact that Defendants are not simply harming Plaintiff by downloading the individual movies, but in the process of downloading, is helping make them available to others so that others can download the illegal movies. Plaintiff has no other option to make the infringement stop than to sue Defendants, and no other way to identify Defendants than through an IP address. And in this case, the consideration of deterrence is significant, particularly given that deterrence was effective. Indeed, since filing the suit, both of Defendants' IP addresses have ceased to further infringe Plaintiff's movies.

Further, if Defendants are not the infringer, and it is someone in their household, Defendant is likely to know who it is. If either Defendant knows who the infringer is but instead of telling Plaintiff so that Plaintiff can substitute the infringer into this case and drop Defendant, continues to fight and incur unnecessary litigation fees – and request a bond for these unreasonable litigations fees – attorney's fees under the copyright act are objectively unreasonable. Given these equities, in the unlikely event either Defendant were to prevail, attorney's fees may not be justified.

4. The AF Holdings Case Is Distinguishable

Defendants cites to *AF Holdings LLC, v. Trinh*, 12-cv-02393-CRB, Nov. 9, 2012 (N.D. Cal. 2012) to support their motion. This case is fundamentally distinguishable from Plaintiff's case. First, AF Holdings was a corporation based in the Federation of Saint Kitts and Nevis. Plaintiff is a California corporation and the Full Faith and Credit Clause of the United States

Constitution permits Defendant to recover from Plaintiff in the unlikely event he prevails and even more unlikely event Plaintiff fails to pay his attorney's fees. "Full Faith and Credit shall be given in each State to the … judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such … Proceedings shall be proved, and the Effect thereof." U.S. Const., Art. IV, § 1.

Second, *AF Holdings* was filed by Prenda Law who is detailed extensively in Judge Wright's opinions. *See* Defendants' Exhibit 1. Their cases were based on one hit date of infringement, their technology was unverified, and their company reeked of fraud. Plaintiff, on the other hand, tried a case earlier this week where three similar defendants were found liable of copyright infringement. *See Malibu Media v. John Doe 1*, et. al. 12-cv-02078-MMB (E.D. Pa. June 6, 2013) CM/ECF 196. Indeed, Plaintiff was awarded over $100,000 dollars in damages because one defendant destroyed evidence and perjured himself before eventually admitting liability. *Id.* Plaintiff's cases are provable and not frivolous.

5. Defendants Ignored Seventh Circuit Precedent

Defendants urge this Court to "consider that frivolous litigation brought by intellectual property 'trolls' is a growing societal problem that burdens the judiciary." CM/ECF 34 at *14. Defendants proposes a solution. Citing a speech by the Chief Judge of the Federal Circuit, a speech which involves patent litigation – a fundamentally different form of litigation – Defendant states: "when the case is over and the court can identify a troll or grasshopper, I strongly advocate full-scale reversal of attorney fees and costs!" "Requiring a Plaintiff like Malibu to post a bond for possible defense costs early in the case will deter it and other Plaintiff's who attempt to 'outmaneuver the legal system' and 'plunder the citizenry'". *Id.*

As stated above and recognized just a week ago by Judge Baylson of the Eastern District of Pennsylvania – Plaintiff is not a copyright troll.  *See Malibu Media v. John Doe 1*, et. al. 12-cv-02078-MMB (E.D. Pa. June 6, 2013) CM/ECF 191.

> There has been a lot of publicity about copyright trolls and patent trolls.  As a matter of fact it has attracted the attention of the White House. … There was an Op Ed in the New York Times recently which included, Randall Radar, who is the Chief Judge of the Federal Circuit, on this topic.  So, copyright infringement is a problem, but copyright and patent trolls are a problem.  But you know I have always been sure of this case… in this case… Malibu is an actual producer of copyrighted material and there is no trolls.  There is no lawyers just acting without clients trying to get money out of people.  And I think that is something worthwhile putting on the record as well.

19:39 – 20:25 Audio Transcript (available through CM/ECF 191).

Defendants' suggestion is not only improper; it is directly against Seventh Circuit precedent, which Defendants conveniently fails to cite.  *See Gay v. Chandra*, 682 F.3d 590, 591 (7th Cir. 2012).  In *Gay v. Chandra*, the Seventh Circuit specifically addressed that is not proper to use the Court's authority to require a plaintiff to post a bond as a sanction or deterrent for filing future suits.  *Id*.

> We agree with Gay that requiring a plaintiff to post a bond to secure costs in a pending suit is different from sanctioning a litigant for failing to pay costs or sanctions from past suits. As we explain below, before requiring a bond to cover costs under Rule 54(d), a court must consider a party's ability to pay. A court abuses its discretion when it requires a cost bond that it knows the party cannot afford.  By contrast, courts can bar *future* suits as a sanction to punish a refusal to pay past court costs and sanctions even if the litigant is indigent. The district court here did not impose a filing bar as a sanction against Gay but invoked only its power to order a bond for costs. The court erred when it ordered Gay to post a bond it knew he could not afford.

*Id*. at 593.

Here, Defendants implicitly acknowledge that Plaintiff will no longer be able to file its copyright suits, and will have to dismiss a significant amount of its current cases, because it cannot afford to post a bond in all of its cases.  Plaintiff is a healthy and successful company but

even the strongest of companies would have difficulty posting $500,000 in order to initiate a suit. Defendants blatantly urge the Court to prevent Plaintiff from accessing the courts for its legitimate copyright claims.   In doing so, Defendants urge the Court to implicitly sanction Plaintiff despite Plaintiff having done nothing wrong.

"A cost bond is not a sanction. It is meant 'to insure that whatever assets a party *does* possess will not have been dissipated or otherwise have become unreachable by the time such costs actually are awarded." *Id*. at 594 (citing *Selletti v. Carey*, 173 F.3d 104, 112 (2d Cir. 1999)).

The Indiana Professional Rules of Conduct state:

(a) A lawyer shall not knowingly:
(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel;

IN ST RPC Rule 3.3.

In Defendants motion, they oddly fail to cite any Seventh Circuit cases regarding the requisite standards for requiring a Plaintiff to post a bond.   This is particular surprising when *Gay v. Chandra* cites to the same cases which Defendants rely on.  "The Ninth Circuit has cited the *Aggarwal* factors with approval and has cautioned that in imposing a bond, "care must **\*595** be taken not to deprive a plaintiff of access to the federal courts." *Simulnet East Assocs.*, 37 F.3d at 575–76. When a court requires a bond it knows a plaintiff cannot pay, the Ninth Circuit reasoned, it is essentially granting judgment to the defendant without allowing the judicial process to run its normal course. *Id.* at 576."   *Gay v. Chandra*, 682 F.3d 590, 594-95 (7th Cir. 2012).  Defendant begins his legal section with a quote from *Simulnet*, "federal district courts have inherent power to require plaintiffs to post security for costs." CM/ECF 34 at \*2 citing *Simulnet E. Associates v. Ramada Hotel Operating Co.*, 37 F.3d 573, 574 (9th Cir. 1994).

14

Likewise, *Gay v. Chandra,* cites to *Murphy v. Ginorio*, 989 F.2d 566, 568 (1st Cir. 1993), another case relied on by Defendants. "The First Circuit concluded that a district court abuses its discretion when it does not consider a plaintiff's financial situation before imposing a cost bond. *Murphy v. Ginorio,* 989 F.2d 566, 568–69 (1st Cir.1993)" *Gay v. Chandra*, 682 F.3d 590, 594 (7th Cir. 2012); *see also Defendant's Motion* CM/ECF 34 at *3 citing *Murphy v. Ginorio*.

*Murphy* aptly sums up the severe challenge Plaintiff would face if this Court followed Defendant's urging. "While recognizing the legitimate interest served by the rule, courts have emphasized that it must be carefully applied to avoid depriving a plaintiff, who may have few financial resources but a legitimate claim, of the opportunity to have a court decide his claim on the merits." *Murphy v. Ginorio*, 989 F.2d 566, 568 (1st Cir. 1993). Indeed, Plaintiff would be deprived of deciding its claims on the merits, which it demonstrated this week are actionable and provable.

**D.**      **Plaintiff Will Be Severely Prejudiced if the Court requires it to Post a Bond**

1.   Requiring Plaintiff to Post a Bond Impedes the Purpose of the Copyright Act and Plaintiff's Right Under the Petition Clause

Malibu Media's goal is to successfully sue the most egregious infringers and at the same time establish a significant deterrent for those tempted to take its products for free. If it were forced to pay a potential award of attorney's fees up front for every infringer it brought suit against, it would not be capable of protecting its copyrights. It would simply be beyond its financial capabilities as a company.

In order for its litigation to have any deterrent effect, Plaintiff must sue enough people for an individual to have a reasonable belief that if they break the law, they will be penalized. Plaintiff cannot do it if each lawsuit requires Plaintiff to post a bond for $500,000 dollars. The longstanding history of the Copyright Act demonstrates that Plaintiff's claims for copyright

infringement are actionable.  Indeed, Congress, the Supreme Court, the United States Copyright Office, several Circuit Courts, and the Executive Branch all have recognized the problem of online infringement.  By requiring Plaintiff to post an exorbitant bond just to bring a claim for copyright infringement, Plaintiff will not be able to sue even the smallest fraction of infringers that regularly steal its content.  This would nullify the Copyright Act which allows Plaintiff to bring this claim and violate Plaintiff's First Amendment right to petition the government.

1.   The Supreme Court and Circuit Courts Hold that Peer-to-Peer Distribution of Copyrighted Works Infringes Upon An Owner's Exclusive Right Under 17 U.S.C. §106

The Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005), found that Grokster was liable for contributory infringement because it materially aided and induced its users to commit direct infringement via its peer-to-peer file sharing service.  Similarly, the First, Second, Seventh, Eighth, Ninth and D.C. Circuits have all held that peer-to-peer infringement is actionable.  *See Sony v. Tennenbaum,* 660 F.3d 487 (1st Cir. 2011) holding in a twenty-six (26) page opinion that Tennenbaum was liable for infringement committed through a peer-to-peer network, that peer-to-peer infringement is not "fair use" nor would any other defense shield Tennenbaum's tortious conduct, and that the statutory damages clause set forth in the Copyright Act is constitutional; *Arista Records, LLC. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) denying an individual John Doe Defendant's motion to quash a subpoena issued to an internet service provider in response to an allegation that the John Doe Defendant infringed Arista's copyrights through a peer-to-peer file sharing network; *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003) upholding a preliminary injunction because Aimster was contributorily liable for its users' direct infringements;  *In re Charter Communications, Inc. Subpoena Enforcement Matter*, 393 F.3d 771, 774 (8th Cir. 2005) opining

that copyright owners have a right to identify peer-to-peer file sharers because those file sharers *are* infringing the owners' copyrights; *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001) "[w]e agree that the plaintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3);" and *RIAA v. Verizon Internet Services, Inc.,* 351 F.3d 1229, 1238 (D.C. Cir. 2003) repetitively acknowledging that file sharing is infringement.  Significantly, "District courts . . . agree . . . that downloading music from the internet, without paying for it or acquiring any rights to it, is a direct violation of the Copyright Act."  *UMG Recording, Inc. v. Alburger*, 2009 WL 3152153, *3 (E.D. PA. 2009).

Both the Eighth and Second Circuits, the only circuits to rule on this issue, have approved the use of Rule 45 subpoenas in on-line infringement cases to identify anonymous Doe Defendants.   The Eight Circuit held "organizations such as the RIAA can file a John Doe suit, along with a motion for third-party discovery of the identity of the otherwise anonymous 'John Doe' defendant."  *In re Charter Communications, Inc., Subpoena Enforcement Matter*, 393 F.3d 771, FN3 (8th Cir. 2005).  Similarly, in *Arista Records, LLC. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) the Second Circuit upheld the District Court's denial of a motion to quash after Arista obtained leave "to serve a subpoena on defendants' common ISP, the State University of New York at Albany."  By so holding, the Second Circuit approved the process of issuing a Rule 45 subpoena to an ISP to identify anonymous Doe Defendants.

2.  <u>Congress Specifically Amended The Copyright Act to Deter Individuals From Committing On-Line Infringement</u>

In 1999 Congress intentionally amended the Copyright Act to deter individuals from infringing copyrights on the internet by increasing the statutory remedies:

> Congress did contemplate that suits like this [against individuals] were within the Act. Congress last amended the Copyright Act in 1999 <u>to increase the</u>

> <u>minimum and maximum awards</u> available under § 504(c).  See Digital Theft
> Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No.
> 106-160, 113 Stat. 1774. At the time, Congress specifically acknowledged that
> consumer-based, noncommercial use of copyrighted materials constituted
> actionable copyright infringement. Congress found that "copyright piracy of
> intellectual property flourishes, assisted in large part by today's world of
> advanced technologies," and cautioned that 'the potential for this problem to
> worsen is great.

*Sony v. Tennenbaum*, 2011 WL 4133920 at *11 (1st Cir. 2011) (emphasis added).

Congress anticipated the impact of infringement on the Internet and specifically considered the avenues for copyright holders to protect its copyrights.  "The DMCA reflected a carefully balanced compromise between those who believed that ISPs should be exposed to potential liability for infringement occurring through use of their services, and those who believed such liability would stifle the growth of the Internet."  *AF Holdings LLC v. Does 1-1,058*, 286 F.R.D. 39, 47 (D.D.C. 2012).  "The DMCA resolved this legal and policy dispute by limiting the liability of ISPs for infringing activity occurring over their networks, while providing mechanisms for copyright owners to protect their copyrighted works with assistance from ISPs when specific evidence of infringing activity was identified."  *Id.*  "Senator Patrick Leahy, co-sponsor of the DMCA stated that Title II of the DMCA 'is intended to preserve incentives for online service providers and copyright owners to cooperate to detect and address copyright infringements that occur in the digital networked environment.'"  *Id*. at 48 citing H.R.Rep. No. 105–796, Comm. on Conf., 72 (1998), 1998 U.S.C.C.A.N. 639, 649.  "ISPs were only shielded from monetary and injunctive liability in exchange for their assistance in identifying subscribers who engage in acts of piracy over their networks and in removing or disabling access of infringers to protected works when technically possible."  *In re Charter Communications, Inc., Subpoena Enforcement Matter*, 393 F.3d 771, 782 (8th Cir. 2005).

By specifically amending the Copyright Act to deter on-line infringement, and constructing the DMCA in a way for ISPs and copyright holders to work together to identify infringers, Congress evinced a clear and unmistakable intent that actions against individuals who infringe copyrights on-line are permitted.

       3.     <u>The Former Register of Copyrights Testified In Front of the Senate That Movie Studios' Copyright Infringement Suits Are Proper</u>

During her time as Register of Copyright, Mary Beth Peters explained the rights of copyright holders in peer-to-peer infringement actions to the Senate Judiciary Committee. "The law is unambiguous. Using peer-to-peer networks to copy or distribute copyrighted works without permission is infringement and copyright owners have every right to invoke the power of the courts to combat such activity. Every court that has addressed the issue has agreed that this activity is infringement." [4] Ms. Peters explained that plaintiffs have a right to bring suits against those that steal its copyrights and these suits are necessary to deter infringement:

> [F]or some users of peer-to-peer technology, even knowledge that what they are doing is illegal will not be a sufficient disincentive to engage in such conduct. But whether or not these infringers know or care that it is against the law, the knowledge that such conduct may lead to expensive and burdensome litigation and a potentially large judgment should have a healthy deterrent effect. <u>While we would like to think that everyone obeys the law simply because it is the law and out of a sense of obligation, we also know that laws without penalties may be widely ignored</u>. For many people, the best form of education about copyright in the internet world is the threat of litigation. In short, if you break the law, you should be prepared to accept the consequences. <u>Copyright owners have every right to enforce their rights in court, whether they are taking action against providers of peer-to-peer services designed to profit from copyright infringement or against the persons engaging in individual acts of infringement using such services.</u>

---

[4] *Pornography, Technology, and Process: Problems and Solutions on Peer-to-Peer Networks Statement of Marybeth Peters The Register of Copyrights before the Committee on the Judiciary* 108th Cong. (2003) *available at* http://www.copyright.gov/docs/regstat090903.html

*Id.* (Emphasis added). The rights the Register of Copyrights so eloquently champions depends on the use of Rule 45 subpoenas.

        4.   The Executive Branch, Congress, Federal Courts And Copyright Owners Are All Very Concerned With The Jobs And Money Lost From Online Piracy

On June 22, 2010, Vice President Biden, speaking for the Executive Branch, said of on-line piracy "[t]his is theft, clear and simple."[5]  "It's smash and grab, no different than a guy walking down Fifth Avenue and smashing the window at Tiffany's and reaching in and grabbing what's in the window." *Id.*  "[O]n February 16, 2011, the Senate Judiciary Committee, led by Chairman Patrick Leahy (D-Vt.), held a hearing . . . about the growing problem of online infringement. . . ."[6]  Leahy said "[t]he problem of online infringement is real; it is substantial; and it is a drain on our economy, which costs American jobs."  *Id.*  He continued "[c]opyright piracy and the sale of counterfeit goods are reported to cost the American economy billions of dollars annually and hundreds of thousands of lost jobs."  *Id.*

The analogy made by Vice President Biden holds true here.  This Court would not fault a retailer for prosecuting a shoplifter.  Indeed, some retailers have a policy to prosecute all shoplifters[7].  This is because shoplifting has a direct impact on a retailer's ability to price its goods, and loss of merchandise raises prices, affecting each lawful consumer.  Copyright infringement on the Internet also directly hurts lawful consumers.  When individuals use the Internet to steal large volumes of copyrighted content through BitTorrent, they use far more bandwidth than the average Internet user.  To compensate, Internet Service Providers raise the cost of Internet service to all customers, making all law abiding citizens pay more for Internet because of copyright infringement.

---

[5] See  http://www.reuters.com/article/2010/06/22/us-usa-trade-web-idUSTRE65L3YN20100622
[6] See http://www.techzone360.com/news/2011/02/16/5318701.htm.
[7] See e.g. Wal-Mart to Prosecute Younger Shoplifters http://www.cbsnews.com/2100-500395_162-3047721.html

     5.   <u>Requiring Plaintiff to Post a Bond Effectively Leaves Plaintiff with a Right without a Remedy</u>

The only way to enforce one's copyrights against online infringement is to bring suits like the one currently before this Court.  Requiring copyright holders to pay a bond for each individual infringement impermissibly burdens Plaintiff because it cannot bring the petitions that need to be brought.  Here, Plaintiff would simply be unable to afford to sue even a handful of infringers per year.  Plaintiff would not be able to effectively deter infringement.  With out this ability, copyright owners would have a right without a remedy.  Any such state of affairs would violate Chief Justice Marshall's often cited rule that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he received an injury."  *Marbury v. Madison*, 1 Cranch 137, 1803 WL 893, *17 (U.S. 1803).

## IV.     CONCLUSION

For the foregoing reasons Plaintiff respectfully requests the Court deny Defendant's Motion that Plaintiff post a bond for attorney's fees and costs.

Dated:  June 14, 2013

                                         Respectfully submitted,

                                       NICOLETTI & ASSOCIATES, PLLC

                                       By:     <u>/s/ *Paul J. Nicoletti*</u>
                                       Paul J. Nicoletti, Esq. (P44419)
                                       36880 Woodward Ave, Suite 100
                                       Bloomfield Hills, MI 48304
                                       Tel:  (248) 203-7800
                                       Fax:  (248) 203-7801
                                       E-Fax: (248) 928-7051
                                       Email:  paul@nicoletti-associates.com
                                       *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   /s/ *Paul J. Nicoletti*

## SERVICE LIST

Paul B. Overhauser, Esq.                                                    *CM/ECF*
Overhauser Law Offices, LLC
740 West Green Meadows Drive, Suite 300
Greenfield, IN 46140
E-mail: poverhauser@overhauser.com
*Attorneys for Defendants Chris Minor*
*and Theresa Stephenson*


David W. Hamilton, Esq.                                                    *CM/ECF*
Rowe & Hamilton
22 East Washington St
Indianapolis, IN 46204
E-mail: dham@indy.net
*Attorney for Defendant Jay Garrett*


Derick Brooks                                                              *U.S. Mail*
529 South 9th Street
Lafayette, IN 47901
*Pro se*


Siwei Li                                                                  *U.S. Mail*
2427 Neil Armstrong Drive, 1A
West Lafayette, IN 47906
*Pro se*